UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

AUG 29 2017

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO. |
| | § | |
| LUIS CARLOS DE LEON-PEREZ, | § | |
| NERVIS GERARDO | § | **17 CR 514** |
| VILLALOBOS-CARDENAS, | § | |
| CESAR DAVID RINCON-GODOY, | § | |
| ALEJANDRO ISTURIZ-CHIESA, | § | |
| AND RAFAEL ERNESTO | § | **UNDER SEAL** |
| REITER-MUNOZ, | § | |
| | § | |
| DEFENDANTS | § | |

## INDICTMENT

THE GRAND JURY CHARGES:

## GENERAL ALLEGATIONS

At all relevant times, unless otherwise specified:

1.     The Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-1, *et seq.*, was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or

retaining business for, or directing business to, any person.

2.     Petroleos de Venezuela S.A. ("PDVSA") was the Venezuelan state-owned and state-controlled oil company. PDVSA and its subsidiaries and affiliates were responsible for the exploration, production, refining, transportation, and trade in energy resources in Venezuela and provided funding for other operations of the Venezuelan government. PDVSA Services, Inc. was the U.S.-based affiliate of PDVSA located in Houston, Texas, that, at various times, was responsible for international purchasing on behalf of PDVSA. Bariven S.A. ("Bariven") was the PDVSA procurement subsidiary responsible for equipment purchases. PDVSA and its wholly owned subsidiaries, including PDVSA Services, Inc. and Bariven, (hereinafter collectively referred to as "PDVSA") were "instrumentalities" of the Venezuelan government as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A). PDVSA officers and employees were "foreign officials" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

3.     PDVSA awarded contracts for energy services and equipment in a number of ways, including through a competitive bidding process. One such competitive bidding process began with a PDVSA purchasing analyst assembling a bidding panel, which identified those companies that would be invited to submit bids in connection for a particular project. PDVSA would then issue a request for

quotation to the companies included on the bidding panel and those companies would in turn submit formal bids, from which a winner would be selected. PDVSA also awarded sole source contracts, which were not subject to a competitive bidding process.  Ultimately, all contracts needed to be approved by more senior PDVSA employees.

4.      Beginning in at least 2011 and continuing until at least 2013, **LUIS CARLOS DE LEON PEREZ, NERVIS GERARDO VILLALOBOS CARDENAS, CESAR DAVID RINCON GODOY, ALEJANDRO ISTURIZ CHIESA,** and **RAFAEL ERNESTO REITER MUNOZ** (collectively, the "Defendants" described more fully below), solicited PDVSA vendors for bribes and kickbacks in exchange for providing assistance to those vendors in connection with their PDVSA business, including assisting them in obtaining PDVSA contracts and assisting them in receiving payment priority over other vendors for outstanding PDVSA invoices during the Venezuelan liquidity crisis.

5.      The Defendants then laundered the proceeds of the bribery scheme through numerous financial transactions, including through international wire transfers to and from bank accounts that they opened in Switzerland, Curaçao, and elsewhere in the names of various companies.

6.      The Defendants sought to conceal the nature of the scheme through various complex financial transactions by directing bribe payments to be sent to

3

various recipients other than the intended PDVSA officials, including companies, intermediaries, relatives, friends, creditors, and close personal associates of the PDVSA officials.

### The Defendants

7.    Defendant **LUIS CARLOS DE LEON PEREZ ("DE LEON")** was a dual citizen of the United States and Venezuela. **DE LEON** was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). **DE LEON** had previously been employed by instrumentalities of the Venezuelan government, but was no longer so employed during the relevant period.

8.    Defendant **NERVIS GERARDO VILLALOBOS CARDENAS ("VILLALOBOS")**, aka "Enano," was a citizen of Venezuela. **VILLALOBOS** had previously been employed by the Venezuelan government and instrumentalities thereof, but was no longer so employed during the relevant period.

9.    Defendant **CESAR DAVID RINCON GODOY ("CESAR RINCON")**, aka "Primo," was a citizen of Venezuela. At all relevant times, **CESAR RINCON** was employed by PDVSA and its subsidiaries, including Bariven, in various capacities, including as the general manager of Bariven. **CESAR RINCON** was a "foreign official" as that term is used in the FCPA, Title

4

15, United States Code, Section 78dd-2(h)(2)(A).

10.     Defendant **ALEJANDRO ISTURIZ CHIESA ("ISTURIZ")**, aka "Piojo" and "Paulo," was a citizen of Venezuela.  During the relevant period, **ISTURIZ** was employed by Bariven as an assistant to the president of Bariven. **ISTURIZ** was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

11.     Defendant **RAFAEL ERNESTO REITER MUNOZ ("REITER")**, aka "Nadal," was a citizen of Venezuela.  At all relevant times, **REITER** was employed by PDVSA as head of security and loss prevention.  **REITER** was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

<u>**The Defendants' Associates and Co-Conspirators**</u>

12.     "CESAR RINCON Relative 1," an individual whose identity is known to the Grand Jury, was a relative of **CESAR RINCON**.

13.     "ISTURIZ Associate 1," an individual whose identity is known to the Grand Jury, provided financial services to **ISTURIZ**.

14.     "REITER Relative 1," an individual whose identity is known to the Grand Jury, was a close relative of **REITER**.

15.     Roberto Enrique Rincon Fernandez ("Rincon"), aka "Pelon," who has been charged separately, was a U.S. lawful permanent resident and a resident of

Texas, and controlled, together with others, a number of closely-held companies,

including several U.S. companies, many of which were based in the Southern

District of Texas, that Rincon used to secure contracts with PDVSA. Rincon was

thus a "domestic concern" and an officer, director, employee, agent, and

shareholder of a "domestic concern" as those terms are used in the FCPA, Title 15,

United States Code, Section 78dd-2(h)(1).

16. "Rincon Company 1," a company whose identity is known to the

Grand Jury, was organized under the laws of Texas and headquartered in the

Southern District of Texas. Rincon Company 1 was thus a "domestic concern" as

that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

Rincon Company 1 was controlled by Rincon and used by Rincon to secure

contracts with PDVSA.

17. "Rincon Company 2," a company whose identity is known to the

Grand Jury, was organized under the laws of Texas and headquartered in the

Southern District of Texas. Rincon Company 2 was thus a "domestic concern" as

that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

Rincon Company 2, along with its Venezuelan-based affiliate (hereinafter

collectively referred to as Rincon Company 2), was controlled by Rincon and used

by Rincon to secure contracts with PDVSA.

18. "Rincon Company 3," a company whose identity is known to the

Grand Jury, was controlled by Rincon and used by Rincon to secure contracts with PDVSA.

19.    "Rincon Company 4," a company whose identity is known to the Grand Jury, was organized under the laws of Texas and headquartered in the Southern District of Texas.  Rincon Company 4 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Rincon Company 4 was controlled by Rincon and used by Rincon to secure contracts with PDVSA.

20.    "Rincon Company 5," a company whose identity is known to the Grand Jury, was organized under the laws of Texas and headquartered in the Southern District of Texas.  Rincon Company 5 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Rincon Company 5 was controlled by Rincon and used by Rincon to secure contracts with PDVSA.

21.    "Rincon Company 6," a company whose identity is known to the Grand Jury, was controlled by Rincon.  Rincon Company 6 was organized under the laws of Texas.  Rincon Company 6 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

22.    "Rincon Company 7," a company whose identity is known to the Grand Jury, was organized under the laws of Texas and headquartered in the

Southern District of Texas.  Rincon Company 7 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Rincon Company 7 was controlled by Rincon and used by Rincon to secure contracts with PDVSA.

23.     "Rincon Associate 1," an individual whose identity is known to the Grand Jury, provided Rincon with certain professional services.

24.     Abraham Jose Shiera Bastidas ("Shiera"), aka "Puma," who has been charged separately, was a Venezuelan national who resided in Florida, and controlled, together with others, a number of closely-held companies, including several U.S. companies, that Shiera used to secure contracts with PDVSA.  Shiera was thus a "domestic concern" and an officer, director, employee, agent, and shareholder of a "domestic concern" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).  Rincon and Shiera worked together on a number of PDVSA contracts and contract bids.

25.     "Shiera Company 1," a company whose identity is known to the Grand Jury, was organized under the laws of Florida and headquartered in Florida. Shiera Company 1 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).  Shiera Company 1 was

controlled by Shiera and used by Shiera to secure contracts with PDVSA.

26.    "Shiera Company 2," a company whose identity is known to the Grand Jury, was organized under the laws of Florida and headquartered in Florida. Shiera Company 2 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).  Shiera Company 2 was controlled by Shiera and used by Shiera to secure contracts with PDVSA.

27.    "Shiera Company 3," a company whose identity is known to the Grand Jury, was organized under the laws of Florida and headquartered in Florida. Shiera Company 3 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).  Shiera Company 3 was controlled by Shiera and used by Shiera to secure contracts with PDVSA.

28.    "Shiera Company 4," a company whose identity is known to the Grand Jury, was controlled by Shiera.

29.    "Shiera Company 5," a company whose identity is known to the Grand Jury, was controlled by Shiera.

30.    "Shiera Company 6," a company whose identity is known to the Grand Jury, was controlled by Shiera.

31.    "Businessman 3," an individual whose identity is known to the Grand Jury, was a U.S. lawful permanent resident and a resident of Florida, and controlled, together with others, a number of closely-held companies, including

several U.S. companies, that Businessman 3 used to secure contracts with PDVSA. Businessman 3 was thus a "domestic concern" and an officer, director, employee, agent, and shareholder of a "domestic concern" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

32.  "Swiss Company A," whose identity is known to the Grand Jury, was a Swiss wealth management firm.

33.  "Swiss Banker 1," an individual whose identity is known to the Grand Jury, was a partner in Swiss Company A.

34.  "Official A," an individual whose identity is known to the Grand Jury, was at all relevant times employed by PDVSA, including as a senior executive of Bariven.

35.  "Official B," an individual whose identity is known to the Grand Jury, was at all relevant times a senior Venezuelan government official.

36.  Official A and Official B were each a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A).

### Other Entities

37.  "Law Firm 1," whose identity is known to the Grand Jury, was a U.S.-based law firm.

38.  "Production Company A," whose identity is known to the Grand Jury, was a U.S.-based film production company.

## COUNT ONE
### (Conspiracy to Commit Money Laundering – 18 U.S.C. § 1956(h))

39.    Paragraphs 1 through 38 are realleged and incorporated by reference as though fully set forth herein.

40.    From in or around 2011 and continuing until at least 2013, in the Southern District of Texas and elsewhere, the defendants,

**LUIS CARLOS DE LEON PEREZ**
**NERVIS GERARDO VILLALOBOS CARDENAS**
**CESAR DAVID RINCON GORDOY**
**ALEJANDRO ISTURIZ CHIESA**
**and**
**RAFAEL ERNESTO REITER MUNOZ**

did knowingly conspire, confederate, and agree with each other and others known and unknown to the Grand Jury to commit offenses under Title 18, United States Code, Section 1956, namely:

a.   knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, to conduct or attempt to conduct such a financial transaction which in fact represented the proceeds of specified unlawful activity, knowing that the transaction is designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, namely, bribery of a foreign official, a felony

11

violation of the FCPA, Title 15, United States Code, Sections 78dd-2, in

violation of Title 18, United States Code, Section 1956(a)(1)(B); and

b. with the intent to promote the carrying on of specified unlawful activity,

namely, bribery of a foreign official, a felony violation of the FCPA,

Title 15, United States Code, Section 78dd-2, transport, transmit, or

transfer funds from a place in the United States to a place outside the

United States, in violation of Title 18, United States Code, Section

1956(a)(2)(A).

### Manner and Means of the Conspiracy

41.     The manner and means by which **DE LEON, VILLALOBOS,**
**CESAR RINCON, ISTURIZ, REITER**, and their co-conspirators sought to
accomplish the purpose of the conspiracy included, among other things, the
following, while in the Southern District of Texas and elsewhere:

42.     **DE LEON, VILLALOBOS, CESAR RINCON, ISTURIZ,** and
**REITER** promised Rincon, Shiera, and others known and unknown to the Grand
Jury assistance with getting paid on outstanding invoices on PDVSA contracts, as
well as assistance with winning new PDVSA contracts, in exchange for bribe
payments.

43.     **DE LEON, VILLALOBOS, CESAR RINCON,** and **ISTURIZ**
solicited assistance, and in turn Rincon, Shiera, and Swiss Banker 1, together with

others, assisted the PDVSA officials in opening bank accounts, including bank

accounts in Switzerland, for the PDVSA officials and their co-conspirators to

receive bribe payments.

44.     **DE LEON, VILLALOBOS, CESAR RINCON, ISTURIZ,** and

**REITER** directed bribe payments to be sent to various recipients other than the

intended PDVSA officials, including companies, intermediaries, relatives, friends,

creditors, and close personal associates of the PDVSA officials, for the purpose of

concealing and disguising the nature, source, and ownership of the bribe payments.

45.     **DE LEON** and **VILLALOBOS**, together with others, engaged in

monetary transactions among their various accounts designed to conceal the nature,

source, and ownership of the proceeds of the specified unlawful activity.

46.     Swiss Banker 1 and **CESAR RINCON**, each and together with

others, created false justifications for certain of the bribes, including invoices for

services that were never performed, for the purpose of concealing and disguising

the nature, source, and ownership of those bribe payments.

47.     Rincon and Shiera, together with others, directed the wire transfer of,

and caused to be wired, bribe payments from bank accounts which were frequently

in the name of companies other than the companies being awarded PDVSA

contracts and receiving payments from PDVSA, for the purpose of concealing and

disguising the nature, source, and ownership of the bribe payments.

## Acts In Furtherance of the Conspiracy

48.     Beginning in at least 2010, Venezuela began to experience a liquidity crisis as the profits earned through PDVSA, which historically had been a significant source of revenue to the Venezuelan government as a result of its oil reserves, were insufficient to meet the government's expenses.  Numerous analysts began to speculate that PDVSA could default on its debt, and the government made public commitments for PDVSA to increase oil production.

49.     Given these liquidity problems, PDVSA was unable to pay all of its vendors in a timely manner, but remained under pressure to continue to escalate oil production.

50.     In or about 2011, Rincon and Shiera were approached by a group of individuals who consisted of then-current PDVSA officials and individuals outside PDVSA with influence at PDVSA, including **DE LEON**, **VILLALOBOS**, and **ISTURIZ**, referred to as the "management team."  The management team offered to give Rincon's and Shiera's companies payment priority over other PDVSA vendors, ensuring that Rincon's and Shiera's companies would get at least partial payment on outstanding PDVSA invoices, and to provide Rincon's and Shiera's companies with assistance in winning future PDVSA business, in exchange for providing a bribe to the management team in the amount of 10% of all payments Rincon and Shiera received from PDVSA.  The management team made similar

14

offers to other vendors known and unknown to the Grand Jury. In addition, individual members of the management team solicited additional bribe payments from Rincon and Shiera.

51.    **DE LEON** and **VILLALOBOS** explained that the bribe proceeds would be split and would be shared among **DE LEON, VILLALOBOS, CESAR RINCON, ISTURIZ, REITER, OFFICIAL A,** and **OFFICIAL B.**

52.    Rincon and Shiera agreed to make the payments to the management team in exchange for payment priority and assistance in winning future PDVSA contracts.

53.    Because they were able to guarantee payment through the corrupt scheme, Rincon and Shiera continued to supply goods and services to PDVSA, thereby enabling PDVSA to continue to do business with such vendors who might not otherwise accept the risk of non-payment.

54.    Payment allocation decisions for vendors were typically documented by Bariven in weekly reports entitled, as translated into English, "Proposal for Payment to International Providers for the Procurement of Materials, Equipment, and Food in Foreign Markets On Behalf of PDVSA and its Subsidiaries." These documents, generally referred to in shorthand (as translated into English) as the payment proposals or proposals, typically contained a "Premise" stating, as translated into English, "The invoicing included in this payment schedule was

coordinated with the international offices of procurement (Houston and the Netherlands) in line with the agreed upon payment conditions and the operational needs coordinated between the hierarchic levels of Bariven and PDVSA's different businesses to ensure the delivery of materials and equipment in order to safeguard the operational continuity of the Industry," then set forth the debt and proposed payments to selected vendors.  The payment proposals were the subject of extensive communications among the Defendants and their co-conspirators, including discussions about how much would be allocated to and among Rincon's and Shiera's companies and discussions about the bribe payments due to the Defendants as a function of how much Rincon's and Shiera's companies were receiving from PDVSA.  **CESAR RINCON** and **ISTURIZ** had responsibility for developing and approving the payment proposals, which were ultimately authorized by Official A.

### Account Set-Up

55.     In order to facilitate the bribe payments and conceal their nature and ownership, **DE LEON** and **VILLALOBOS** and their co-conspirators engaged Swiss Company A to set up Swiss bank accounts into which bribe payments could be received and to assist in providing justifications for the payments.

56.     Ultimately, a number of accounts, in Switzerland and elsewhere, were used in connection with the scheme.  These accounts were used to funnel the bribes

from, to, and through multiple destinations before reaching their ultimate recipient.

57. "Swiss Account 1," whose identity is known to the Grand Jury, was a Swiss bank account for which **DE LEON** was a beneficial owner and **VILLALOBOS** and **DE LEON** were authorized signers. Swiss Account 1 was used in connection with the scheme.

58. "Swiss Account 2," whose identity is known to the Grand Jury, was a Swiss bank account. Swiss Account 2 was used in connection with the scheme.

59. "Swiss Account 3," whose identity is known to the Grand Jury, was a Swiss bank account. Swiss Account 3 was used in connection with the scheme.

60. "Swiss Account 4," whose identity is known to the Grand Jury, was a Swiss bank account. Swiss Account 4 was used in connection with the scheme.

61. "Swiss Account 5," whose identity is known to the Grand Jury, was a Swiss bank account owned and controlled by Rincon and Shiera. Swiss Account 5 was used in connection with the scheme.

62. "Swiss Account 6," whose identity is known to the Grand Jury, was a Swiss bank account owned and controlled by Shiera. Swiss Account 6 was used in connection with the scheme.

63. "Swiss Account 7," whose identity is known to the Grand Jury, was a Swiss bank account owned and controlled by **ISTURIZ**. Swiss Account 7 was

used in connection with the scheme.

64.    "Swiss Account 8," whose identity is known to the Grand Jury, was a Swiss bank account owned and controlled by **CESAR RINCON**.  Swiss Account 8 was used in connection with the scheme.

65.    "Swiss Account 9," whose identity is known to the Grand Jury, was a Swiss bank account.  Swiss Account 9 was used in connection with the scheme.

66.    "Curaçao Account 1," whose identity is known to the Grand Jury, was a Curaçaoan bank account.   Curaçao Account 1 was used in connection with the scheme.

67.     "U.S. Account 1," whose identity is known to the Grand Jury, was a U.S. bank account.  U.S. Account 1 was used in connection with the scheme.

68.    Some of these accounts were not simply used to funnel bribe payments, but also to provide false justifications for the payments themselves.  For example, on or about September 12, 2011, a letter and services agreement was submitted through Swiss Company A to a Swiss bank in connection with the request to open Swiss Account 1.  The letter set forth a purported sub-contracting arrangement between Swiss Account 5 and Swiss Account 1 in which Swiss Account 1 was to assist Swiss Account 5 in providing services to Rincon Company 1.  Similarly, on or about April 19, 2012, Swiss Accounts 2, 3, and 4 sent a letter to Swiss Company A and Swiss Account 1 stating the general fund distribution from

18

Swiss Account 1 to Swiss Accounts 2, 3, and 4 and setting forth various services purportedly provided by Swiss Accounts 2, 3, and 4 on behalf of Swiss Account 1 to Swiss Account 5 and Shiera Company 5.

69.     The Defendants, Shiera, Rincon, and their co-conspirators communicated, including via e-mail, phone, and various messaging applications, about the account set-up and the need to submit documentation to justify the payments.  For example, on or about September 8, 2011, Shiera sent **VILLALOBOS** a message using BlackBerry Messenger ("BBM") stating, as translated into English, "The institution has not accepted the stick.  They are asking me for invoices and purchase orders.   I already submitted them.   I hope it is resolved tomorrow."  The conspirators frequently used the word "stick" (as translated into English) to refer to money.

70.     The Defendants ultimately established a complex web of bank accounts through which to conduct the financial transactions in connection with the scheme and conceal the nature and ownership of the proceeds.  On or about September 16, 2011, Swiss Banker 1 wrote to Shiera, **VILLALOBOS,** and **DE LEON** to report that Swiss Company A had set up four bank accounts – Swiss Account 1, which Swiss Banker 1 referred to as the "main account," Swiss Account 2, which Swiss Banker 1 identified as being for **VILLALOBOS**, Swiss Account 3, which Swiss Banker 1 identified as being for **DE LEON**, and Swiss

19

Account 4, which Swiss Banker 1 identified as being for Official A.  Swiss Banker 1 concluded the e-mail by stating, "We will **email you next week the new account numbers and the wiring instructions** to begin transfer of funds into the main a/c ([Swiss Account 1]) for distribution into the 3 accounts."

71.     Swiss Company A, facilitated by Rincon and Shiera, also assisted the Defendants in opening individual accounts in the names of various entities rather than in the Defendants' own names.  For example, on or about February 1, 2013, **CESAR RINCON** sent Shiera an e-mail attaching his passport and utility bill. Shiera then forwarded this information to Swiss Banker 1, who requested in addition a copy of **CESAR RINCON**'s curriculum vitae.  Swiss Banker 1 asked Shiera, "Shall I go ahead and order a new Nevis company for Cesar?"  Shiera replied to the e-mail, noting his agreement.

72.     On or about February 6, 2013, Swiss Banker 1 sent Shiera an e-mail stating, "A new Nevis company called [Swiss Account 8] will be formed with Cesar as the Director/BO/Shareholder."

### Payments to the Management Team and Official Assistance to Rincon and Shiera

73.     Rincon and Shiera made payments for the benefit of **DE LEON, VILLALOBOS, CESAR RINCON, ISTURIZ,** and **REITER** using a variety of bank accounts in the United States (including in the Southern District of Texas), Switzerland, and Panama, to a variety of bank accounts, including, but not limited

to, the accounts referenced in Paragraphs 57 to 67 above.

74.    For example, in total, accounts controlled by Rincon and Shiera transferred over $27 million to Swiss Account 1, which transferred over $10 million to Swiss Account 2, over $16 million to Swiss Account 3, and over $1 million to Swiss Account 4, in connection with the scheme.

75.    In exchange for these bribe and kickback payments, **DE LEON, VILLALOBOS, CESAR RINCON, ISTURIZ,** and **REITER** provided assistance to Rincon and Shiera in getting paid on outstanding PDVSA invoices and obtaining new PDVSA contracts.

76.    For example, on or about October 10, 2011, **ISTURIZ** sent Shiera a BBM message stating, as translated into English, "I got for you and Pelon [Rincon] [Rincon Company 4] 1.3mm [Rincon Company 2] 1.2mm and [Shiera Company 2] 6.9." Shiera replied, as translated into English, "That [Shiera Company 2] is his.  I need in [Shiera Company 1] and [Shiera Company 3].  Check it please." **ISTURIZ** later responded, as translated into English, "Shit, bro, I had sent it already!  Let me see what I can do!", to which Shiera replied, "Change it please." **ISTURIZ** responded, as translated into English, "Pumita! [Shiera]  Relax, let Piojo [**ISTURIZ**] pamper you!", to which Shiera replied, as translated into English, "I'm

in need of love $$$$$$ hahahaha."

77.     Consistent with **ISTURIZ**'s BBM message, on or about October 17, 2011, PDVSA sent $6,980,000 to Shiera Company 2.

78.     After several inter-company transfers, the funds referenced in Paragraph 77 above were ultimately transferred to Rincon Company 2.  On or about October 26, 2011, Rincon Company 2 transferred $515,513.20 to Swiss Account 1.  Shortly thereafter, on or about November 2, 2011, Shiera Company 5 transferred $179,552.52 to Swiss Account 1.  Then, on or about November 16, 2011, Swiss Account 1 transferred $100,000 to Swiss Account 2, $330,000 to Swiss Account 3, and $215,000 to Swiss Account 4.

79.     The Defendants frequently checked with Shiera and Rincon on the status of the bribe payments.  For example, on or about December 20, 2011, **VILLALOBOS** sent Shiera a BBM message stating, as translated into English, "don't forget to talk with your administrator, it Is vital the flow comes in December," which the conspirators understood to refer to bribe payments.  Shiera responded, as translated into English, "He just confirmed you'll have it before this Friday."

80.     On or about December 22, 2011, Shiera Company 5 made two transfers to Swiss Account 1, one in the amount of $299,901.85 and another in the

amount of $362,485.68.

81.    Rincon and Shiera frequently used **DE LEON** and **VILLALOBOS** as intermediaries for communications with or about the PDVSA officials. For example, on or about November 24, 2011, Shiera sent **VILLALOBOS** a BBM message stating, as translated into English, "Brother, Piojo [**ISTURIZ**] never fails. He put mine at like $3.5M on the proposal and 5 for the ones from Pelon [Rincon] according to what we talked about at dinner.  Give him support." **VILLALOBOS** responded, as translated into English, "That guy is good."

82.    In addition to help getting paid on outstanding invoices, Rincon and Shiera also asked the Defendants for their assistance in winning PDVSA contracts. For example, on or about January 4, 2012, Shiera sent **VILLALOBOS** a BBM message requesting **VILLALOBOS**'s assistance in securing a contract over a competitor to supply equipment in relation to a PDVSA project.

83.    On or about February 8, 2012, Shiera sent **ISTURIZ** a BBM message asking, as translated into English, "What's happened with the Motorgenerators?" to which **ISTURIZ** replied, as translated into English, "Cesar must sign it!  I'll tell him."

84.    The Defendants corresponded with Rincon and Shiera about PDVSA bidding panels as well as the official actions the Defendants would take on behalf of Rincon and Shiera.  For example, on or about February 24, 2012, Shiera sent

**ISTURIZ** a BBM message with a proposed panel of bidders for an electric equipment panel. **ISTURIZ** responded, as translated into English, "Good!  Give me the panels for the others!!  Get people moving on that!  Look, I have all the purchasers from my office beating them hard," to which Shiera replied, as translated into English, "That is my Piojo."

85.   In addition to allowing Rincon and Shiera to have input on PDVSA bidding panels, as discussed in Paragraph 84 above, the Defendants gave Rincon and Shiera inside information on upcoming PDVSA projects so that they could choose the projects that their companies bid on.  For example, on or about February 28, 2012, **ISTURIZ** e-mailed Rincon and Shiera, stating, as translated into English, "I'm sending you a list of the process that we need to start tomorrow. They're processes for the E&P [exploration and production] and Gas moments.  I started with e&p, because that's where the strength lies!  I need to know before 10 am in which processes you want to get involved in and the panel."

86.   On or about March 1, 2012, Rincon responded to the email from **ISTURIZ** referenced in Paragraph 85 above, copying Shiera, stating, as translated into English, "Attached you will find what we are going to work on highlighted in YELLOW.  These are drilling parts and equipment.  There is one from Abraham." Attached was a highlighted list of equipment PDVSA sought to purchase with the

corresponding internal budgets.

87.     The Defendants frequently sent Rincon and Shiera updates of the money they expected to receive in bribes in exchange for the payments Rincon and Shiera were receiving on outstanding PDVSA invoices as a result of the bribery scheme.  The Defendants occasionally sent Rincon and Shiera the payment proposals themselves, either in draft form for input or in final form so Rincon and Shiera could see how much money their companies were expected to receive (and, in turn, how much they would need to pay in bribes).  For example, on or about January 5, 2012, **ISTURIZ** sent Rincon an e-mail stating, as translated into English, "I need you to check these numbers.  They are the payments for payment proposal.  The date that is on each payment corresponds to the Monday of the week of the proposal.  The date will not coincide with the one on which you received the money, don't focus on that, just the amounts."  Attached was a PDVSA payment proposal document setting forth vendors to be paid, (including a number of Rincon's companies) and the dates and amounts of the payments.

88.     In addition, on or about May 17, 2013, **CESAR RINCON** sent himself a PDVSA payment proposal from his PDVSA e-mail account to a personal e-mail account.  He forwarded it to **VILLALOBOS**, Shiera, and Rincon with the message, as translated into English, "I've attached the proposal reviewed and approved by [Official A]."  The attached payment proposal included payments to a

number of Shiera's and Rincon's companies, including Shiera Company 1, Shiera

Company 2, Shiera Company 3, Rincon Company 2, Rincon Company 5, and

Rincon Company 7.

89.    The Defendants also frequently reminded Rincon and Shiera of how

much they owed in bribe payments, using coded or vague language to conceal

what they were talking about.  For example, on or about March 15, 2012, **DE

LEON** sent Shiera a BBM message stating, as translated into English, "Were you

able to able to buy the things?  Debt from the friends as of today $1,093,232,"

which the conspirators understood to be a reference to outstanding bribe payments.

90.    Within a week of **DE LEON**'s message, accounts controlled by

Shiera and Rincon then made a series of transfers to Swiss Account 1, totaling just

over $1 million.  On or about March 19, 2012, Swiss Account 5 transferred

$536,005.42 to Swiss Account 1.  The next day, March 20, 2012, Shiera Company

5 transferred $281,781.34 to Swiss Account 1.  Finally, on or about March 22,

2012, Shiera Company 5 transferred $193,021.47 to Swiss Account 1.

91.    In order to conceal the nature and ownership of the bribe proceeds,

**ISTURIZ** sent Rincon and Shiera instructions to pay various bank accounts, held

in the names of various companies.  **ISTURIZ** made coded references to paying

bribes in exchange for future PDVSA business.  For example, on or about March

22, 2012, **ISTURIZ** sent Rincon and Shiera an e-mail stating, as translated into

English, "Hi P and P, I'm sending you the coordinates in order for you to send me something to buy coal to keep cooking the stew. . . . We can use this account while we're opening the other one." **ISTURIZ** concluded the e-mail with the account and wire information for Curaçao Account 1.

92.    On or about April 2, 2012, Rincon Company 2 transferred $450,000 from its bank account in the Southern District of Texas to Curaçao Account 1. Over the following several weeks, Curaçao Account 1 made a series of transfers to Swiss Account 7.

93.    On or about May 13, 2012, **ISTURIZ** sent Rincon and Shiera an e-mail stating, as translated into English, "Dear friends, I'm sending you the coordinates to move ahead somewhat on the payments while the other account is being opened. I need to notify the friend at the bank before the money arrives. Attached is a spreadsheet showing a summary of the payments over the past 3 weeks." Set forth below was the account and wire information for Swiss Account 7. Attached was a chart setting forth various Rincon and Shiera companies, the amounts they had been paid by PDVSA for a three-week period and two figures representing bribe payments due in the amount of 10% and 2%.

94.    On or about May 16, 2012, Rincon Company 2 transferred $116,949.72 to Curaçao Account 1. Subsequently, Curaçao Account 1 made two

transfers to Swiss Account 7.

95.     On or about June 1, 2012, Rincon Company 2 transferred $766,428.39 to Swiss Account 7.

96.     On or about June 18, 2012, **ISTURIZ** sent Rincon and Shiera an e-mail stating, as translated into English, "Dear colleagues, I am sending you the Excel file with the summary of the payments and the great debt you have with Paulo!"

97.     On or about June 19, 2012, Rincon responded to **ISTURIZ**, stating, as translated into English, "To date we have transferred the following amounts: 450,000 [Curaçao Account 1], 116,949.72 [Curaçao Account 1], 766,428.39 [Swiss Account 7], 367,069.19 [Swiss Account 7].  THE TOTAL IS…USD 1,700,447.30.  Paulo, the problem is that sometimes we take the amount considering the entire payment and sometimes we need to subtract 5% for our allies'…  Forgive the trouble but it is being deposited today and this way we have a difference of USD 000000000000000000000000000.00."

98.     On or about June 19, 2012, Rincon Company 2 transferred $367,069.19 to Swiss Account 7.

99.     On or about June 21, 2012, Rincon Company 6 transferred $69,427.81 to Swiss Account 7.

100.    Rincon frequently sent confirmations of bribe payments he had made

to the defendants.  For example, on or about May 15, 2012, Rincon Company 2 transferred $200,000 to Swiss Account 9.  The following day, Rincon sent the wire confirmation to **CESAR RINCON.**

101.   Similarly, on or about June 19, 2012, Rincon Company 2 transferred $115,000 to Swiss Account 9.  On or about June 21, 2012, Rincon forwarded the wire confirmation to **CESAR RINCON**, who replied, as translated into English, "All good, Thanks."

102.   On several occasions, **ISTURIZ** referenced the fact that the financial transactions through which he sought to receive bribe payments were designed to conceal the nature and ownership of the proceeds.  On or about July 12, 2012, **ISTURIZ** forwarded account and wire information for U.S. Account 1 from ISTURIZ Associate 1 to Rincon and Shiera, copying ISTURIZ Associate 1. **ISTURIZ** stated, as translated into English, "I am sending the instructions in order to start using this route.  Copy to the person who is responsible for setting everything up so that it is all really well shielded."

103.   On or about July 24, 2012, Shiera Company 6 transferred $323,045.27 to U.S. Account 1.

104.   On or about July 31, 2012, Rincon Company 2 transferred $450,000 from its account in the Southern District of Texas to U.S. Account 1.

105.   On or about August 1, 2012, Rincon Company 2 transferred

29

$533,729.77 from its account in the Southern District of Texas to U.S. Account 1.

106.   On or about August 10, 2012, U.S. Account 1 transferred $445,785 to Swiss Account 7.

107.   On or about August 13, 2012, U.S. Account 1 transferred $625,056 to Swiss Account 7.

108.   On or about August 29, 2012, **ISTURIZ** sent Rincon and Shiera an e-mail stating, as translated into English, "I am sending you the list up to this week's proposal, which I am putting together.  The numbers are going to stay like this! Merry Christmas even though it isn't."  Attached were four charts – the first two set forth various Rincon companies and various Shiera companies, along with the amounts that each had been paid by PDVSA over the course of several weeks.  The second two, entitled "RR" and "AS," respectively, set forth various payment amounts and payment destinations for bribe payments to **ISTURIZ**.

109.   On or about November 30, 2012, Shiera sent **DE LEON** a BBM message stating, as translated into English, "I have $20MM approved to collect for this week.  I'd appreciate your help with at least one invoice for 15MM.  Let me know."  On the same day, **DE LEON** replied, "I'll help you with the payment."

110.   On or about February 19, 2013, Rincon Company 2 transferred $200,000 to an account in the name of REITER Relative 1.  Rincon sent the

payment confirmation to **REITER** by e-mail.

111.   On or about February 21, 2013, Rincon Company 2 transferred $250,000 to an account in the name of REITER Relative 1.  Rincon sent the payment confirmation to **REITER** by e-mail.

112.   **DE LEON** and **VILLALOBOS** continued to act as intermediaries between Rincon and Shiera and PDVSA officials.  For example, on or about March 11, 2013, **VILLALOBOS** sent Shiera a BBM message stating, as translated into English, "Did you get the second one for Nadal [**REITER**]?  The one for 130?" Shiera sent **VILLALOBOS** a BBM message stating, as translated into English, "The $130k transfer was returned to me, they say that the iban is wrong.   Can you ask for it again?  This is Nadal's [**REITER's**]."  **VILLALOBOS** responded, as translated into English, "Yes that is it, I'm going to ask for it."

113.   For example, in or about March 13, 2013, **VILLALOBOS** sent Shiera a BBM message stating, as translated into English, "Brother, I met with Primo [**CESAR RINCON**], I asked him to adjust the proposal with around 75 percent of your invoice to convince [Official A] to sign it. . . ."

114.   In addition, on or about May 3, 2013, **VILLALOBOS** sent Shiera a BBM message stating, as translated into English, "[Official A] wrote to me, he said he got a good ration this week."

115.   In order to disguise the nature and ownership of the bribe proceeds,

instead of having money sent directly to an account he controlled, **REITER** frequently directed bribe money to third parties for his benefit. For example, **REITER** directed that some of the money he was owed in connection with the scheme be used to purchase a condominium in the name of a company controlled by REITER Relative 1. On or about August 16, 2012, a representative of Law Firm 1 sent Rincon Associate 1 the closing documents for a condominium at the Four Seasons in Miami and requested that Rincon Associate 1 direct REITER Relative 1 to execute the documents. The documents reflected that the buyer of the condominium was a Florida corporation of which REITER Relative 1 was the president.

116.   On or about August 17, 2012, Rincon sent **REITER** an e-mail, attaching the closing documentation referenced in Paragraph 115 above, stating, as translated into English, "I need this signed by [REITER Relative 1] and returned to me." On or about August 21, 2012, **REITER** returned the documents referenced in Paragraph 115 to Rincon by e-mail, executed by REITER Relative 1.

117.   On or about August 23, 2012, Rincon Company 5 transferred $867,619.62 to Law Firm 1's attorney trust account, in connection with the purchase of the condominium for **REITER** referenced in Paragraph 115 above.

118.   **REITER** also directed Rincon to invest in a film on his behalf. After **REITER** forwarded Rincon an investment agreement from Production Company

A to invest in a film, on or about May 21, 2013, at the direction of Rincon

Associate 1, Rincon Company 7 transferred $1.5 million to Production Company

A.  Rincon sent the confirmation of the transfer to **REITER** by e-mail.

119.   On or about September 14, 2013, Rincon, copying **CESAR**

**RINCON**, directed a relative by e-mail to send $200,000 to Swiss Account 8.

**CESAR RINCON** replied, as translated into English, "Thanks Cousin!"

120.   On or about September 16, 2013, Rincon Company 2 transferred

$200,000 to Swiss Account 8.

### Gifts and Other Things of Value

121.   In addition to monetary bribes, Rincon and Shiera provided the

Defendants with gifts, recreational travel, and other things of value in exchange for

their assistance in connection with Rincon's and Shiera's business with PDVSA.

122.   For example, on or about November 30, 2011, Shiera received a

reservation confirmation by e-mail for a beach house in Parrot Cay in the Bahamas

made in the name of **ISTURIZ**, which Shiera then forwarded on to **ISTURIZ**

noting, as translated into English, "Done, Piojo."

123.   Similarly, on or about June 6, 2013, a luxury hotel in Aruba sent

Shiera confirmations for a number of hotel rooms, including one for **CESAR**

**RINCON** and **REITER**.  A note next to both **CESAR RINCON**'s and

REITER's room confirmations stated, "This room will be paid by Mr. Shiera."

124.   In addition, on or about January 15, 2013, Rincon Company 2 purchased a $107,500 armored car from a company in Texas for the benefit of **REITER.**  On or about March 18, 2013, Rincon Company 2 purchased a second $107,500 armored car from a company in Texas for the benefit of **REITER.**

125.   On or about August 1, 2013, Rincon purchased a $10,300 handbag for REITER Relative 1 at a store in the Southern District of Texas.

126.   On or about June 26, 2014, **REITER** forwarded Rincon invoices for English classes for two of Official B's children, one in the amount of $16,672 and the other in the amount of $8,755.

127.   On or about July 4, 2014, Rincon Company 2 made two transfers, one in the amount of $16,672 and the other in the amount of $8,755, to a bank account in the name of the school where Official B's children were taking English classes.


All in violation of Title 18, United States Code, Section 1956(h).

## COUNT TWO
### (Conspiracy – 18 U.S.C. § 371)

### (Defendants DE LEON and VILLALOBOS)

128.   Paragraphs 1 through 38 and 41 through 127 are realleged and incorporated by reference as though fully set forth herein.

129.   Beginning in at least 2011 and continuing through at least 2013, in the Southern District of Texas, and elsewhere, the defendants,

### LUIS CARLOS DE LEON PEREZ
### and
### NERVIS GERARDO VILLALOBOS CARDENAS

did willfully and knowingly conspire, confederate, and agree with each other and others known and unknown to the Grand Jury to commit offenses against the United States, that is:

to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all and a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of:  (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in

35

violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Rincon, Shiera, and their U.S. companies in obtaining and retaining business for and with, and directing business to, Rincon, Shiera, their companies, and others, in violation of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-2(a).

### Purpose of the Conspiracy

130.   The purpose of the conspiracy was for **DE LEON, VILLALOBOS**, and their co-conspirators, to enrich themselves and others by directing bribes to PDVSA officials to assist Rincon, Shiera, and others in obtaining and retaining lucrative energy contracts with PDVSA through corrupt and fraudulent means, including by paying bribes to PDVSA officials, and by keeping a portion of those bribes.

### Manner and Means of the Conspiracy

131.   The manner and means by which **DE LEON** and **VILLALOBOS** and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the Southern District of Texas and elsewhere:

36

132.   **DE LEON** and **VILLALOBOS** offered Rincon and Shiera, as well as others, the opportunity to receive payment priority over other PDVSA vendors on outstanding PDVSA invoices and to receive assistance in winning future PDVSA contracts, in exchange for bribes paid to members of the "management team," including **CESAR RINCON, ISTURIZ, REITER,** Official A, and Official B, of which **DE LEON** and **VILLALOBOS** would receive a portion.

133.   At the direction of **DE LEON** and **VILLALOBOS,** Rincon and Shiera, together with others, paid bribes to the management team through the use of interstate and foreign wires in order to secure any improper business advantage, influence acts and decisions of the PDVSA officials, including **CESAR RINCON, ISTURIZ,** and **REITER** in their official capacities, and to induce the PDVSA officials to do and omit to do certain acts, including, but not limited to:

a.     including Rincon's and Shiera's companies on payment proposals and approving those payment proposals so that Rincon's and Shiera's companies could receive payments on outstanding PDVSA invoices;

b.     assisting Rincon's and Shiera's companies in winning PDVSA contracts;

c.     providing Rincon and Shiera with inside information concerning the PDVSA bidding process;

d.      placing one or more of Rincon's and Shiera's companies on certain

bidding panels for PDVSA projects;

e.      ensuring that Rincon and Shiera were not subject to any internal

investigations at PDVSA.

134.   At the direction of **DE LEON** and **VILLALOBOS,** Rincon and

Shiera, together with others, caused bribe payments to be wired from the bank

accounts of Rincon's companies and Shiera's companies to bank accounts

controlled by **DE LEON** and **VILLALOBOS** with the understanding that the

funds would be split among **DE LEON, VILLALOBOS, CESAR RINCON,**

**ISTURIZ, REITER,** Official A, and Official B.

135.   In addition to monetary bribes, Rincon and Shiera, together with

others, provided other things of value to the management team, including **DE**

**LEON, VILLALOBOS, CESAR RINCON, ISTURIZ,** and **REITER**, including

recreational travel, vehicles, gifts (including watches and wine), meals, and

entertainment, in order to receive payment priority on outstanding PDVSA

invoices and to obtain and retain business with PDVSA.

## Overt Acts

136.   In furtherance of the conspiracy and to achieve the objects thereof, at

least one of the co-conspirators committed or caused to be committed, in the

Southern District of Texas and elsewhere, at least one of the following overt acts, among others:

137.   On or about September 16, 2011, Swiss Banker 1 e-mailed Shiera, **VILLALOBOS,** and **DE LEON**, stating that Swiss Company A had set up four bank accounts – Swiss Account 1, which Swiss Banker 1 referred to as the "main account," Swiss Account 2, which Swiss Banker 1 identified as being for **VILLALOBOS**, Swiss Account 3, which Swiss Banker 1 identified as being for **DE LEON**, and Swiss Account 4, which Swiss Banker 1 identified as being for Official A.  Swiss Banker 1 concluded the e-mail by stating, "We will **email you next week the new account numbers and the wiring instructions** to begin transfer of funds into the main a/c ([Swiss Account 1]) for distribution into the 3 accounts."

138.   On or about December 7, 2011, Swiss Account 5 transferred $602,790.96 to Swiss Account 1.

139.   On or about December 16, 2011, Shiera Company 5 transferred $47,212.14 to Swiss Account 1.

140.   On or about December 20, 2011, **VILLALOBOS** sent Shiera a BBM message stating, as translated into English, "don't forget to talk with your administrator, It Is vital the flow comes in December," which the conspirators understood to refer to bribe payments."  Shiera responded, as translated into

39

English, "He just confirmed you'll have it before this Friday."

141.   On or about December 21, 2011, Swiss Account 1 made two transfers to Swiss Account 3, one in the amount of $587,269.20 and another in the amount of $1,370,294.80.

142.   On or about December 22, 2011, Shiera Company 5 made two transfers to Swiss Account 1, one in the amount of $299,901.85 and another in the amount of $362,485.68.

143.   On or about December 23, 2011, **VILLALOBOS** sent Shiera a BBM message stating, as translated into English, "Do you know if that invoice of mine was paid?"  Shiera replied, as translated into English, "Brother, the 1000 will be deposited on Monday."

144.   On or about December 27, 2011, **VILLALOBOS** sent Shiera a BBM message stating, as translated into English, "The deposit for the little stick has not arrived, sorry to bother you, but it is vital for this week."

145.   On or about January 4, 2012, Shiera Company 5 transferred $60,658.26 to Swiss Account 1.

146.   On or about February 10, 2012, Swiss Account 5 transferred $1,373,227.89 to Swiss Account 1.

147.   On or about February 13, 2012, Shiera Company 5 transferred

$121,300.70 to Swiss Account 1.

148.   On or about February 15, 2012, Shiera sent **DE LEON** a BBM

message stating, as translated into English, "Last week the payment for $322,021

was completed in two parts, one is for $121,400 and the other is $200,621.  On the

other hand, this week we are paying $1,785,223 corresponding to $1,000,000 for

the plane and $788,255 from the last collection received."

149.   On or about February 15, 2012, Swiss Account 5 transferred

$611,211.52 to Swiss Account 1.

150.   On or about February 16, 2012, Shiera Company 5 transferred

$200,522.43 to Swiss Account 1.

151.   On or about February 17, 2012, Rincon Company 3 transferred

$257,436 to Swiss Account 1.

152.   On or about February 21, 2012, Swiss Account 1 transferred

$4,000,000 to Swiss Account 3 and $1,400,000 to Swiss Account 4.

153.   On or about March 15, 2012, **DE LEON** sent Shiera a BBM message

stating, as translated into English, "Were you able to able to buy the things?  Debt

from the friends as of today $1,093,232," which the conspirators understood to be

a reference to outstanding bribe payments.

154.   On or about March 19, 2012, Swiss Account 5 transferred

$536,005.42 to Swiss Account 1.

155.   On or about March 20, 2012, Shiera Company 5 transferred $281,781.34 to Swiss Account 1.

156.   On or about March 22, 2012, Shiera Company 5 transferred $193,021.47 to Swiss Account 1.

157.   On or about November 30, 2012, Shiera sent **DE LEON** a BBM message stating, as translated into English, "I have $20MM approved to collect for this week.  I'd appreciate your help with at least one invoice for $15MM.  Let me know."  On the same day, **DE LEON** replied, "I'll help you with the payment."

158.   On or about January 21, 2013, **DE LEON** sent Shiera a BBM message stating, "Enano [**VILLALOBOS**] told me to transfer you what's pending up to mid Dec.  It's about 1.5 M."

159.   On or about March 13, 2013, **VILLALOBOS** sent Shiera a BBM message stating, as translated into English, "Brother, I met with Primo [**CESAR RINCON**], I asked him to adjust the proposal with around 75 percent of your invoice to convince [Official A] to sign it…"

All in violation of Title 18, United States Code, Section 371.

## COUNT THREE
### (Conspiracy to Commit Money Laundering – 18 U.S.C. § 1956(h))

### (Defendant CESAR RINCON)

160.   Paragraphs 1 through 38 and 41 through 127 are realleged and incorporated by reference as though fully set forth herein.

161.   From in or around 2011 and continuing until at least 2014, in the Southern District of Texas and elsewhere, the defendant,

### CESAR DAVID RINCON GORDOY

did knowingly conspire, confederate, and agree with others known and unknown to the Grand Jury to commit offenses under Title 18, United States Code, Section 1956, namely:

knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, to conduct or attempt to conduct such a financial transaction which in fact represented the proceeds of specified unlawful activity, knowing that the transaction is designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, namely, bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2, in violation of Title 18, United States Code, Section 1956(a)(1)(B).

### Manner and Means of the Conspiracy

162.   The manner and means by which **CESAR RINCON** and his co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the Southern District of Texas and elsewhere:

163.   **CESAR RINCON** promised Businessman 3 assistance with getting paid on outstanding invoices on PDVSA contracts, as well as assistance with winning new PDVSA contracts, in exchange for bribe payments.

164.   **CESAR RINCON** directed bribe payments to be sent to various recipients other than himself, including companies, intermediaries, relatives, friends, and close personal associates, including payments through or to bank accounts in the Southern District of Texas, for the purpose of concealing and disguising the nature, source, and ownership of the bribe payments.

165.   **CESAR RINCON**, together with others, created false justifications for certain of the bribes, including invoices for services that were never performed, for the purpose of concealing and disguising the nature, source, and ownership of those bribe payments.

### Acts In Furtherance of the Conspiracy

166.   On or about February 29, 2012, **CESAR RINCON** sent Businessman 3 an e-mail, stating, as translated into English, "They are asking me over there if you sent the candy to [CESAR RINCON Relative 1]," which the conspirators

44

understood to refer to bribe payments.  Businessman 3 replied, as translated into English, "That candy will be sent to [CESAR RINCON Relative 1]'s house today." Later that day, Businessman 3 wrote to **CESAR RINCON** again, stating, as translated into English, "I have a little problem with sending all of the candy today. I need to get it out of the main store to send it to the branch and you know that we have to be careful with that here but I can send a good load today."

167.   Also on or about February 29, 2012, a company controlled by Businessman 3 transferred $150,710 to an account in the name of **CESAR RINCON** Relative 1.  Businessman 3 forwarded the wire confirmation to **CESAR RINCON**, stating, as translated into English, "Sir, It was sent.  Thank you for everything. . . ."

168.   On or about November 16, 2012, **CESAR RINCON** sent Businessman 3 an e-mail stating, as translated into English, "I am attaching the invoices for [CESAR RINCON Relative 1]'s transfers."  Attached was an invoice in the amount of $110,000 from a company controlled by CESAR RINCON Relative 1 and another relative to a company controlled by Businessman 3 purportedly for "Technical assistance" on a maintenance project.

169.   On or about February 14, 2013, Businessman 3 signed a $110,000 check from a company he controlled to a company controlled by CESAR RINCON Relative 1 and another relative.  The memo line of the check referenced an invoice

number that matched the number on the invoice **CESAR RINCON** sent to

Businessman 3 on November 16, 2012 referenced in Paragraph 168 above.

170.   On or about February 15, 2013, the check referenced in Paragraph 169

above was presented for payment.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT FOUR
### (Money Laundering – 18 U.S.C. § 1956(a)(1)(B)(i); 18 U.S.C. § 2)

### (Defendants DE LEON and VILLALOBOS)

171.   Paragraphs 1 through 38, 41 through 127, and 131 through 159 are

realleged and incorporated by reference as though fully set forth herein.

172.   On or about the dates set forth below, in the Southern District of

Texas and elsewhere, the defendants,

### LUIS CARLOS DE LEON PEREZ
### and
### NERVIS GERARDO VILLALOBOS CARDENAS,

did knowingly conduct, and aid, abet, and cause others to conduct, and attempt to

conduct, the following financial transactions affecting interstate and foreign

commerce, which transactions involved the proceeds of specified unlawful activity,

knowing that the property involved in the financial transactions represented the

proceeds of some form of unlawful activity, and that the financial transactions

were designed, in whole and in part, to conceal and disguise the nature, the

location, the source, the ownership, and the control of the proceeds of said

specified unlawful activity, that is, a felony violation of the FCPA, Title 15, United

States Code, Sections 78dd-2, as follows:

A $515,513.20 wire from Rincon Company 2 to Swiss Account 1 on or

about October 26, 2011.

47

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## COUNTS FIVE-SEVEN
### (Money Laundering – 18 U.S.C. § 1956(a)(1)(B)(i); 18 U.S.C. § 2)

### (Defendant DE LEON)

173.   Paragraphs 1 through 38, 41 through 127, and 131 through 159 are realleged and incorporated by reference as though fully set forth herein.

174.   On or about the dates set forth below, in the Southern District of Texas and elsewhere, the defendant,

### LUIS CARLOS DE LEON PEREZ,

did knowingly conduct, and aid, abet, and cause others to conduct, and attempt to conduct, the following financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and that the financial transactions were designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity, that is, a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2, as follows:

49

| COUNT | DATE | MONETARY TRANSACTION |
|-------|------|----------------------|
| Five | March 19, 2012 | $536,005.42 transfer from Swiss Account 5 to Swiss Account 1 |
| Six | March 20, 2012 | $281,781.34 transfer from Shiera Company 5 to Swiss Account 1 |
| Seven | March 22, 2012 | $193,021.47 transfer from Shiera Company 5 to Swiss Account 1 |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## COUNTS EIGHT-ELEVEN
### (Money Laundering – 18 U.S.C. § 1956(a)(1)(B)(i); 18 U.S.C. § 2)

### (Defendant CESAR RINCON)

175.   Paragraphs 1 through 38, 41 through 127, 131 through 159, and 162 through 170 are realleged and incorporated by reference as though fully set forth herein.

176.   On or about the dates set forth below, in the Southern District of Texas and elsewhere, the defendant,

### CESAR DAVID RINCON GODOY,

did knowingly conduct, and aid, abet, and cause others to conduct, and attempt to conduct, the following financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and that the financial transactions were designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity, that is, a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2, as follows:

| COUNT | DATE | MONETARY TRANSACTION |
|-------|------|----------------------|
| Eight | February 29, 2012 | $150,710 wire transfer from a company controlled by Businessman 3 to a bank |

| COUNT | DATE | MONETARY TRANSACTION |
|---|---|---|
| | | account in the name of CESAR RINCON Relative 1 |
| Nine | May 15, 2012 | $200,000 wire transfer from Rincon Company 2 to Swiss Account 9 |
| Ten | June 19, 2012 | $115,000 wire transfer from Rincon Company 2 to Swiss Account 9 |
| Eleven | February 15, 2013 | $110,000 check from a company controlled by Businessman 3 to a company controlled by CESAR RINCON Relative 1 and another relative |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## COUNTS TWELVE-SIXTEEN
### (Money Laundering – 18 U.S.C. § 1956(a)(1)(B)(i); 18 U.S.C. § 2)

### (Defendant ISTURIZ)

177.   Paragraphs 1 through 38, 41 through 127, and 131 through 159 are realleged and incorporated by reference as though fully set forth herein.

178.   On or about the dates set forth below, in the Southern District of Texas and elsewhere, the defendant,

### ALEJANDRO ISTURIZ CHIESA,

did knowingly conduct, and aid, abet, and cause others to conduct, and attempt to conduct, the following financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and that the financial transactions were designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity, that is, a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2, as follows:

| COUNT | DATE | MONETARY TRANSACTION |
|-------|------|---------------------|
| Twelve | June 1, 2012 | $766,428.39 wire transfer from Rincon Company 2 to Swiss Account 7 |
| Thirteen | June 19, 2012 | $367,069.19 wire transfer from Rincon Company 2 to Swiss Account 7 |

| COUNT | DATE | MONETARY TRANSACTION |
|---|---|---|
| Fourteen | June 21, 2012 | $69,427.81 transfer from Rincon Company 6 to Swiss Account 7 |
| Fifteen | August 10, 2012 | $445,785 wire transfer from U.S. Account 1 to Swiss Account 7 |
| Sixteen | August 13, 2012 | $625,056 wire transfer from U.S. Account 1 to Swiss Account 7 |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i)

and 2.

## COUNTS SEVENTEEN-TWENTY
## (Money Laundering – 18 U.S.C. § 1956(a)(1)(B)(i); 18 U.S.C. § 2)

### (Defendant REITER)

179.    Paragraphs 1 through 38, 41 through 127, and 131 through 159 are realleged and incorporated by reference as though fully set forth herein.

180.    On or about the dates set forth below, in the Southern District of Texas and elsewhere, the defendant,

### RAFAEL ERNESTO REITER MUNOZ,

did knowingly conduct, and aid, abet, and cause others to conduct, and attempt to conduct, the following financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and that the financial transactions were designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity, that is, a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2, as follows:

| COUNT | DATE | MONETARY TRANSACTION |
|-------|------|----------------------|
| Seventeen | August 23, 2012 | $867,619.62 wire transfer from Rincon Company 5 to Law Firm 1 |
| Eighteen | February 19, 2013 | $200,000 wire transfer from Rincon Company 2 to REITER Relative 1 |

55

| COUNT | DATE | MONETARY TRANSACTION |
|-------|------|----------------------|
| Nineteen | February 21, 2013 | $250,000 wire transfer from Rincon Company 2 to REITER Relative 1 |
| Twenty | May 21, 2013 | $1,500,000 wire transfer from Rincon Company 7 to Production Company A |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## NOTICE OF CRIMINAL FORFEITURE
### (28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C))

181.   Pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C), the United States gives notice to the defendants,

### LUIS CARLOS DE LEON PEREZ
### and
### NERVIS GERARDO VILLALOBOS CARDENAS,

that in the event of conviction of the offense charged in Count 2 of this Indictment, the United States intends to seek forfeiture of all property, real or personal, which constitutes or is derived from proceeds traceable to such offenses.

## NOTICE OF FORFEITURE
### (18 U.S.C. § 982(a)(1))

182.   Pursuant to Title 18, United States Code, Section 982(a)(1), the United States gives notice to the defendants,

### LUIS CARLOS DE LEON PEREZ,
### NERVIS GERARDO VILLALOBOS CARDENAS,
### CESAR DAVID RINCON GODOY,
### ALEJANDRO ISTURIZ CHIESA,
### and

56

**RAFAEL ERNESTO REITER MUNOZ,**

that upon conviction of any of the offenses charged in Count 1 and Counts 3 through 20 of this Indictment, the United States intends to seek forfeiture of all property, real or personal, involved in money laundering offenses or traceable to such property.

## PROPERTY IN SUBSTITUTION

183.   In the event that a condition listed in Title 21, United States Code, Section 853(p) exists, the United States may seek to forfeit any other property of the defendants in substitution up to the total value of the property subject to forfeiture.  The United States may seek the imposition of a money judgment against each defendant.

A TRUE BILL

ORIGINAL SIGNATURE ON FILE

FOREPERSON

ABE MARTINEZ
ACTING UNITED STATES
ATTORNEY

SANDRA MOSER
ACTING CHIEF, FRAUD
SECTION
CRIMINAL DIVISION
DEPARTMENT OF JUSTICE

BY: _____
JOHN P. PEARSON
DEPUTY CHIEF
ROBERT S. JOHNSON
ASSISTANT UNITED STATES
ATTORNEY

BY: _____
AISLING O'SHEA
JEREMY R. SANDERS
TRIAL ATTORNEYS

57